[Cite as *In re J.M.*, 2025-Ohio-5318.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: J.M.
    J.R.

C.A. Nos.    31578
                31579


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN 23-12-1078
              DN 23-12-1081

DECISION AND JOURNAL ENTRY

Dated: November 26, 2025

SUTTON, Judge.

**{¶1}** Appellant, T.N. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her minor children in the permanent custody of Summit County Children Services Board (CSB"). This Court affirms.

I.

**{¶2}** Mother is the biological mother of J.M., born June 30, 2018; and J.R.,[1] born September 18, 2019. The children's father had minimal involvement in the trial court proceedings and did not appeal the trial court's judgment. Mother gave birth to another child during this case.

---

[1] J.R.'s name was corrected to J.M. during the trial court proceedings, but the trial court continued to refer to him as J.R. This Court will also refer to him as J.R. to distinguish him from his sibling.

That child was also removed from Mother's custody and placed in the temporary custody of CSB but is not a party to this appeal.

{¶3} Mother also has two older children who are not parties to this appeal, but the juvenile cases pertaining to them are relevant to this case. More than ten years ago, Mother was involved in a juvenile case in Summit County pertaining to her oldest child, D.P. Few details about that child or case are included in the record except that the Summit County Juvenile Court ultimately placed D.P. in the legal custody of the maternal great grandmother.

{¶4} During 2015, Stark County Department of Job and Family Services (SCDJFS) opened a case pertaining to Mother's then infant child, L.P. The child was born with amphetamine in her system, and Mother had a history of drug abuse and an inability to care for her older child. Mother and the child's father also lacked stable housing or the ability to meet the child's basic needs. L.P. was later adjudicated a dependent child. The trial court initially permitted L.P. to live with Mother in the home of a maternal relative under an order of protective supervision, but later removed the child from that home because Mother did not cooperate with the relative who was supervising her contact with L.P. SCDJFS ultimately moved for permanent custody of L.P. based on several alternative grounds under R.C. 2151.414(E). *See* R.C. 2151.414(B)(1)(a). On May 24, 2016, the Stark County Juvenile Court involuntarily terminated Mother's parental rights and placed L.P. in the permanent custody of SCDJFS.

{¶5} When this case began, Mother was living with J.M., J.R., and her husband, who is not the father of these children. CSB received a referral about ongoing drug use by Mother and her husband and the unsafe and unsanitary condition of the children and the home. Police conducted a welfare check of the home, and found it to be filthy and unsuitable for the children. Among other problems, the family had eight dogs living inside, with feces spread all over the

home, and the smell of the home was described by numerous witnesses as unbearable. In lieu of a Juv.R. 6 removal of the children, Mother agreed to engage in an out-of-home safety plan with CSB, which required the children to live with an adult the family knew from their church. That adult, the safety plan monitor, later informed CSB that he could no longer keep the children in his home, and the parents did not identify any other adults to care for the children.

{¶6} On December 29, 2023, CSB filed complaints to allege that J.M. and J.R. were neglected and dependent children because of suspected drug use by Mother, the unsafe and unsanitary home conditions and potential eviction from that home, and Mother's failure to meet other basic needs of the children. Specifically, both children were filthy when CSB became involved with the family; they were diagnosed with mental health and/or developmental disorders but were not engaged in any services; they had suffered from medical and dental neglect and required extensive dental treatment; and the school-aged child was not attending school. The children also were not toilet trained and not meeting several other developmental milestones.

{¶7} The parents waived their rights to adjudicatory and dispositional hearings. Pursuant to the parties' stipulation, the trial court adjudicated J.M. and J.R. dependent under R.C. 2151.04(C), as alleged in the complaint. The parents also agreed that the trial court would place the children in the temporary custody of CSB and adopt the case plan as an order of the court.

{¶8} The case plan required Mother to obtain a mental health and substance abuse assessment and engage in recommended treatment, submit to regular drug screens, participate in parenting instruction and other services to learn about her children's special and basic needs, work with service providers to repair dangers and clean up her home, and demonstrate that she could provide a safe and sanitary home for her children. Mother did not consistently engage in mental

health or substance abuse treatment, did not submit to drug screening as required, and did not engage in hands-on parenting instruction to learn how to meet her children's needs.

{¶9} Mother also made minimal progress toward obtaining and maintaining a safe and sanitary home. She moved into a different home near the beginning of this case, but it had many safety hazards and Mother continued to own several large dogs that she kept inside and failed to keep the home clean. Mother rehomed some of her dogs and enlisted the help of others to clean her home and repair some of the safety hazards, but the home remained dirty, unsafe, and unsuitable for her young children.

{¶10} Another problem at the beginning of this case was Mother's failure to keep the children clean and tend to her own personal hygiene. Mother's personal hygiene remained a problem throughout this case. Mother failed to regularly bathe and/or change and wash her clothes, such that other parents complained to CSB about Mother's presence at the indoor visitation center due to the smell. The caseworker offered to supply Mother with soap and other hygiene products, and to connect her with service agencies to assist her. Mother did not take advantage of those services, and her personal hygiene did not improve during this case. When the weather permitted, Mother's supervised visits with J.M. and J.R. were moved to an outdoor park so that other families did not have to be exposed to her unpleasant odor.

{¶11} On December 10, 2024, CSB moved for a first six-month extension of temporary custody and Mother moved for legal custody, but Mother later withdrew her motion. Following a hearing before a magistrate, the trial court denied the agency's request to extend temporary custody. Neither parent filed objections to that decision.

{¶12} CSB moved for permanent custody of J.M. and J.R., alleging numerous alternative grounds under R.C. 2151.414(E) and that permanent custody was in the best interest of the

children.  *See* R.C. 2151.414(B)(1)(a).  Mother alternatively requested a six-month extension of temporary custody.  After an evidentiary hearing, the trial court terminated parental rights and placed J.R. and J.M. in the permanent custody of CSB.  Mother appeals and raises two assignments of error.  This Court will address them in reverse order to facilitate review.

II.

## ASSIGNMENT OF ERROR II

A REVERSIBLE ERROR EXISTS BECAUSE AN ATTORNEY WAS NOT [] APPOINTED TO REPRESENT THE CHILDREN AT TRIAL WHEN A CONFLICT EXISTED BETWEEN THEIR EXPRESSED WISHES AND THE GAL'S RECOMMENDATION.

{¶13}  Mother's second assignment of error is that the trial court erred in failing to appoint an attorney to represent the children because they wanted to go home but the guardian ad litem recommended permanent custody to CSB.  Children who are subjects of a permanent custody proceeding may be entitled to independent counsel if their guardian ad litem recommends a disposition that conflicts with the children's wishes.  *In re J.P.-M.*, 2007-Ohio-5412, ¶ 53 (9th Dist.), citing *In re Williams*, 2004-Ohio-1500, syllabus and ¶ 18.  *See also* Juv.R. 4(C) ("If a person is serving as Guardian ad litem for a child or ward, and the court finds a conflict exists between the role of the Guardian ad litem and the interest or wishes of the child or the ward, the court shall appoint counsel for the child or ward.").  "In determining whether to appoint independent counsel for a child, the juvenile court should consider the particular circumstances of the case, including the child's maturity and whether the guardian ad litem can adequately represent the child."  *In re L.F.*, 2021-Ohio-3431, ¶ 17 (9th Dist.).

{¶14}  This issue was raised for the first time at the permanent custody hearing during the testimony of the guardian ad litem.  According to the record, that was the first time that the parties became aware that the children, then five and six years old, had told the guardian ad litem that they

missed Mother and wanted to return to her. The trial judge asked the guardian ad litem why she had not requested the appointment of independent counsel for the children because their wishes conflicted with her recommendation. The guardian ad litem explained that she had consulted throughout this case with the children's therapists and concluded that the children were too immature to understand the concept of a permanent home. Therefore, she did not believe that there was a conflict between the children's expressed wishes and her recommendation that permanent custody was in their best interest. Nevertheless, the trial court sua sponte appointed counsel to represent the children and continued the hearing for a third day of testimony.

{¶15} Mother's argument does not address the significant fact that the trial court did, in fact, appoint an attorney to represent the children at the conclusion of the second hearing date. The parties reconvened for an additional day of hearing approximately three weeks later. The children's attorney testified about her discussions with each of the children and explained that both children expressed that they did not want to return to Mother's home but wanted to stay where they were. Mother's counsel had the opportunity to cross-examine the children's attorney but did not. On appeal, Mother does not argue that the children's attorney did not adequately protect their interests in these proceedings. Mother's second assignment of error is overruled accordingly.

## ASSIGNMENT OF ERROR I

THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

{¶16} Mother's first assignment of error is that the trial court's permanent custody judgment is against the manifest weight of the evidence. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a

consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶17} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶18} On the first prong of the permanent custody test, the trial court found that the children could not be returned to the custody of Mother within a reasonable time or should not be returned to her custody based on the grounds set forth in R.C. 2151.414(E)(11). *See* R.C. 2151.414(B)(1)(a). CSB presented certified records from Stark County Juvenile Court, including the 2016 involuntary termination of Mother's parental rights to L.P., an older sibling of these children. Based on the records and testimony presented at the hearing, the trial court found that Mother had her parental rights involuntarily terminated as to a sibling of these children and failed to prove that, "notwithstanding the prior termination, [she] can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child[ren]." R.C. 2151.414(E)(11). Mother does not challenge this significant finding by the trial court that she currently could not provide for the wellbeing of her children.

{¶19} Although Mother does not challenge this finding, a brief review of the relevant evidence is in order, as it also pertains to the children's best interest. By the time of the hearing in May 2025, Mother had the opportunity to work on reunification for nearly one and a half years, yet she had not consistently engaged in any services. Her substance abuse and mental health counselor testified that Mother needed consistent substance abuse and trauma counseling but that she had not attended her sessions as scheduled. Between October 2024 and January 2025, Mother's attendance was so poor that she was terminated by the agency. She had just reengaged in counseling a few months before the final hearing.

{¶20} Throughout this case, Mother failed to engage in hands-on parenting instruction to learn how to meet the basic and special needs of her children. While the children had been in her custody, she had failed to meet many of their basic needs yet failed to recognize her shortcomings in that regard. They came into CSB custody at the ages of 4 and 5 but were not toilet trained and were filthy; they had rotten teeth in their mouths that needed to be extracted; and each suffered from significant behavioral problems that had not been addressed. Throughout this case, Mother denied that her children had any behavioral problems.

{¶21} Mother also had not verified that she had a stable income, and she did not have suitable housing. Despite receiving help from others to clean and repair her house, there were still broken windows and other safety hazards that had not been repaired. Several witnesses testified that Mother's home was not as filthy as it was several months earlier, but that it was not clean enough for young children. Mother still had several large dogs, and the home had visible feces smeared on the floors and walls. The guardian ad litem testified that the smell in Mother's home was unlike any other home she had visited in the past. She explained that, even during her most

recent visit, "I have to wear a mask when I go there. I have to change my shoes. It is not just a normal smells like dogs smell. It is horrific."

{¶22} Next, the trial court found that permanent custody was in the best interest of the children. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in R.C. 2151.414(D). *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). The trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the children, their wishes, their custodial history, their need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). Because the trial court found that the factor set forth in R.C. 2151.414(E)(11) applied in this case, it was required to again consider that factor in its best interest analysis.

{¶23} The children's interaction with Mother during this case was limited to weekly supervised visits. CSB never decreased the level of supervision because Mother failed to consistently engage in case plan services or demonstrate that she was able to care for the children without assistance. In addition to failing to consistently address her own mental health, Mother did not engage in any hands-on parenting instruction with the children or attempt to stay informed about their progress in counseling or other intervention services. Each child had mental health and behavioral problems, yet Mother had not recognized or addressed those problems while they were in her custody. In fact, she continued to deny that they had any problems. J.M. was diagnosed with ADHD and autism, and J.R. was diagnosed with post-traumatic stress disorder and conduct disorder. Because J.R. was extremely violent with others and sometimes engaged in self-harming

behavior, his counselor suspected that he might have a more serious mental illness, but he was still too young for a diagnosis.

{¶24} The wishes of the children were initially expressed by the guardian ad litem. She testified that the children wanted to return to Mother but that she did not believe that they understood the concept of a permanent home. She opined that permanent custody was in their best interest. As explained already, the trial court appointed independent counsel to represent the children. The hearing continued several weeks later, after counsel had the opportunity to explore the issue with the children. The children's counsel testified on the final day of the hearing that the children no longer wanted to return to Mother but wished to stay where they were.

{¶25} Throughout their short lives, the custodial history of these children included spending their formative years in an unstable home with Mother, who failed to meet their basic needs. During this case, the children were moved in and out of several homes because of their highly aggressive behavior. Early in this case, J.M. was briefly placed in a residential treatment center because "his behaviors were too extreme for a foster home." Through ongoing counseling, psychiatric medication, and the safety and security of their most recent foster homes, each child was learning how to control his impulsiveness and was making progress reaching developmental milestones. Their counselors opined that each child needed to remain in a stable and structured environment, which Mother was unable to provide. CSB had not found any suitable relatives for placement, so the trial court concluded that a legally secure permanent placement would be achieved by placing the children in the permanent custody of CSB.

{¶26} Finally, the trial court was required to again consider that Mother previously had her parental rights involuntarily terminated to an older sibling of these children and that, despite that prior termination, Mother failed to demonstrate that she was able to provide the children with

a safe and secure home. *See* R.C. 2151.414(D)(1)(e); R.C. 2151.414(E)(11). As previously explained in detail, this finding was supported by substantial evidence. Notably, Mother has not challenged this finding on appeal, that she failed to rebut the presumption that, because of the prior termination of her parental rights, she remains unable to provide her children with a suitable home. *See, e.g., In re A.H.*, 2024-Ohio-502, ¶ 17 (9th Dist.); *In re X.N.*, 2021-Ohio-3633, ¶ 26 (9th Dist.).

{¶27} Given all the evidence before the trial court, this Court cannot say that it lost its way in terminating Mother's parental rights and placing J.R. and J.M. in the permanent custody of CSB. *See Eastley* at ¶ 20. Mother's first assignment of error is overruled.

III.

{¶28} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETTY SUTTON
FOR THE COURT

CARR, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

ALISA BOLES, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and ASHLEE JAMES, Assistant Prosecuting Attorney, for Appellee.